UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| CRYSTAL SUMMERLOT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:08-CV-00437 CAN |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

On September 22, 2008, Plaintiff, Crystal Summerlot ("Summerlot"), filed her complaint in this Court. On January 8, 2009, Summerlot filed an opening brief, in which she asks this Court to enter judgment in her favor or to remand this matter to the Commissioner. On March 26, 2009, Defendant, Commissioner of Social Security ("Commissioner") filed its response brief. On April 16, 2009, Summerlot filed her reply brief. This Court now enters its ruling based upon the record of this case that includes the pleadings, the motions, the administrative record, briefs of the parties, and the arguments of counsel.

**I.   PROCEDURE**

On August 11, 2004, Summerlot filed her application for Supplemental Security Income ("SSI"). (Tr. 59-66). Summerlot claims she is entitled to benefits pursuant to Titles XVI of the Social Security Act. See 42 U.S.C. §§ 416(I), 423. Summerlot's application was initially denied and again upon reconsideration. (Tr. 51-55, 46-48).

On August 10, 2007, Summerlot appeared, with counsel, at a hearing before an Administrative Law Judge ("ALJ"), who issued a denial of Summerlot's claim. (Tr. 293-323).

1

The ALJ found that Summerlot had not engaged in substantial gainful activity since August 11, 2004. (Tr. 18). Further, the ALJ found that Summerlot's impairments of post-traumatic stress disorder, fibromyalgia[1], and chronic fatigue syndrome were severe, and her impairment of anti-phospholipid syndrome[2] was not severe. (Id.). However, the ALJ found that Summerlot did not have any impairments that meet one of the listed impairments in 20 C.F.R. app.1, subpart P. § 404. (Id.). The ALJ found that Summerlot had the residual functional capacity ("RFC") to perform a restricted range of light work "limited to simple, routine, repetitive tasks," involving limited conversation and interaction with co-workers, lifting and carrying 20 pounds occasionally and 10 pounds frequently, and standing or walking up to 6 hours per day (Tr. 20). Thereafter, although Summerlot had no past relevant work, the ALJ found that Summerlot could perform other jobs that exist in significant numbers in the national economy. (Tr. 24-25). Thus, the ALJ determined that Summerlot was not disabled. (Id.).

Summerlot appealed the ALJ's decision to the Appeals Council. (Tr. 9-12). The Appeals Council denied review; and as a result, the ALJ's decision became the Commissioner's final decision. 20 C.F.R. § 404.981, Fast v. Barnhart, 397 F.3d 468, 470 (7th Cir. 2005). Consequently, on September 22, 2009, Summerlot filed a complaint in this Court seeking a

---

[1] Fibromyalgia is a syndrome of chronic pain of musculoskeletal origin but uncertain cause. Criteria includes pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest); additionally there must be point tenderness in at least 11 of 18 specified sites. Stedmans.com, Online Medical Dictionary, http://www.stedmans.com/section.cfm/45 (last visited June 11, 2009).

[2] Antiphospholipid Antibody Syndrome ("APS") is an autoimmune disorder often associated with recurrent clotting events (thrombosis) including premature stroke, repeated miscarriages, phlebitis, venous thrombosis (clot in the vein) and pulmonary thromboembolism (blockage of an artery found in the lung due to a clot that has traveled from a vein). It is also associated with low platelet or blood elements that prevent bleeding. Recently, however, even more disease states have been linked with APL, including premature heart attack, migraine headaches, various cardiac valvular abnormalities, skin lesions, abnormal movement/chorea, diseases that mimic multiple sclerosis, vascular diseases of the eye that can lead to visual loss and blindness. APSFA.org, What is APS?, http://www.apsfa.org/index.html (last visited June 11, 2009).

review of the ALJ's decision. This Court may enter a ruling in this matter based on the parties' consent. See 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

**II.    ANALYSIS**

   A.    Facts

At the time of the ALJ's decision, Summerlot was 32 years old and had a high school education with one year of college. (Tr. 73). She does not have any relevant work experience. (Tr. 24). Summerlot alleged that she suffers from both physical and psychological limitations. (Tr. 19). Specifically, Summerlot alleged that she suffers from anxiety and anti-phospholoid syndrome. (Tr. 67). Summerlot alleged a disability onset date of August 1, 1992. (Tr. 59, 68). However, Summerlot did not file an application for SSI until August 11, 1994. (Tr. 59-66).

Summerlot reported that she is often fatigued and has difficulty completing everyday activities. (Tr. 78-79). She testified that, on the average day, she must lie down for three to four hours due to such fatigue. (Tr. 303). She also testified that she is often unable to complete her household tasks because "the pain is so bad" that she often feels sick to her stomach. (Tr. 299). Summerlot also stated that sometimes she must sit down due to pain. (Tr. 302). Additionally, Summerlot alleged that she suffers from pounding migraine headaches, often coupled with episodes in which she cannot talk or move. (Tr. 299-301). Summerlot asserted that she takes medication for both pain and depression but claims that the medication sometimes eases the pain and sometimes does not (Tr. 298-299). Moreover, Summerlot testified that her psychological problems, arising from a history of past abuse, make it uncomfortable to be around other people. (Tr. 305-307). She also reported that her husband does most of the housework and all of the cooking because her fatigue prevents her from doing so herself. (Tr. 304).

Summerlot's husband also testified that he does all of the cooking, all of the shopping, and most of house cleaning because of Summerlot's condition. (Tr. 310). He testified that he is no longer able to work because he must remain at home to take care of Summerlot and their two youngest children. (Tr. 308).

1.  Dr. Clouse

For treatment of her physical and psychological problems, Summerlot has primarily seen Dr. Jodi Clouse ("Dr. Clouse"), her family physician, since 2002. (Tr. 297). On February 9, 2004, Dr. Clouse first reported that Summerlot had a history of antiphospholipid syndrome ("APS") and multiple spontaneous abortions. (Tr. 234). On January 26, 2005, Summerlot again saw Dr. Clouse and described experiencing episodes in which she was unable to move or talk, as well as frequent numbness. (Tr. 270). Dr. Clouse referred Summerlot for a neurological evaluation and a rheumatology evaluation. (Id.).

On March 25, 2005, Summerlot saw Dr. Clouse and reported that the Cleveland Clinic had diagnosed her with fibromyalgia and chronic fatigue syndrome. (Tr. 269). She reported that she was having a lot of pain, problems with memory, and that Elavil was making her fatigued. (Tr. 269). Dr. Clouse confirmed the diagnosis of fibromyalgia and chronic fatigue syndrome and gave her samples of Cymbalta and Daypro. (Tr. 269). Subsequently, Summerlot indicated to Dr. Clouse that she felt a little bit more depressed and was experiencing increased pain. (Tr. 269). Dr. Clouse examined Summerlot and did not identify any specific trigger points, but increased Summerlot's medication and recommended an exercise program. (Tr. 269). Soon after, Dr. Clouse discovered that Summerlot was pregnant and ordered her to stop all of her medication. (Tr. 268). Summerlot indicated that she was in a lot of pain, including muscle spasms and

4

muscle discomfort, especially at night, and that it was hard for her to sleep. (Tr. 268).

On March 17, 2006, Summerlot saw Dr. Clouse and reported that she had experienced several episodes in which she could not talk or move, but was aware of her surroundings. (Tr. 264). She indicated that these episodes always happened at night and could happen several times in a row. (Tr. 264). Dr. Clouse increased Summerlot's medication. (Tr. 264).

Subsequently, on November 9, 2006, Dr. Clouse completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) at the request of Summerlot's attorney and opined that Summerlot could lift and/or carry less than 10 pounds; stand and/or walk less than 2 hours in an 8-hour workday; sit less than 6 hours in an 8-hour workday; and was limited in her ability to push and/or pull with her upper extremities. (Tr. 228-29). She also stated that Summerlot could never climb, balance, kneel, crouch, crawl, or stoop. (Tr. 229). Dr. Clouse further asserted that Summerlot could occasionally reach, handle, finger, and feel. (Tr. 230). In addition, Dr. Clouse opined that temperature extremes, noise, dust, vibration, humidity/wetness, hazards/machinery/heights, and fumes/odors/chemicals/gases would all cause a flare-up of her asthma. (Tr. 231).

On July 20, 2004, during the same period in which Summerlot was receiving treatment from Dr. Clouse, Summerlot went to Kosciusko Community Hospital with complaints of migraine headaches. (Tr. 120). Summerlot was diagnosed with a migraine headache, given an injection of Demerol, which was effective, and discharged home. (Tr. 121-122).

2. Non-Treating Physicians

a. Dr. Michael E. Holton ("Dr. Holton")

Dr. Holton examined Summerlot on December 12, 2004, at the request of the State

Agency. (Tr. 158-60). Summerlot alleged disability due to anxiety and APS and complained of ongoing fatigue, visual disturbances, numbness and weakness in her legs, and that she fell occasionally. (Tr. 158). Dr. Holton described Summerlot as alert and well-developed and reported no perceived difficulty with Summerlot getting out of a chair or on the examination table. (Id.). Summerlot's extremities revealed no edema, she had no difficulty walking, hopping, or squatting, and her muscle strength was full at 5/5 in all extremities. (Tr. 159). Dr. Holton's impression was "chronic fatigue and visual disturbances, reportedly attributable to anti-phospholipids syndrome" and a "history of depression with anxiety features." (Tr. 160).

    b. <u>Dr. Wayne J. Von Bargen, ("Dr. Von Bargen")</u>

 On January 12, 2005, Wayne J. Von Bargen, Ph.D., conducted a mental status evaluation of Summerlot at the request of the State Agency. (Tr. 163-65). Dr. Von Bargen described Summerlot as cooperative and noted that the content of her speech was "logical, relevant, and coherent." (Tr. 163). Summerlot reported that her mother died when she was two years old, she was molested by both her father and her brother, and she was raised by her aunt who used to beat her. (Tr. 163-64). Summerlot said that if she went to work "it would be nothing but crying. I don't like being around people." (Tr. 163). Dr. Von Bargen opined that Summerlot had major depressive disorder of a moderate severity and post-traumatic stress disorder. (Tr. 164). He stated that "she has suffered an astounding array of traumas and tragedies, and it is remarkable that she is functioning as well as she apparently does." (Id.). He opined that Summerlot "is able to adequately care of herself and perform routine daily activities" and that "[h]er cognitive functioning is intact." (Id.). He assigned Summerlot a Global Assessment of Functioning ("GAF") score 55. (Tr. 165).

6

    c.  Dr. B. Whitley ("Dr. Whitley") and Dr. K. Neville ("Dr. Neville")

On January 28, 2005, Dr. Whitley, a State Agency physician, reviewed the evidence of record and opined that Summerlot did not have a severe physical impairment. (Tr. 166). On April 19, 2005, Dr. J. Gaddy, ("Dr. Gaddy"), also a State Agency physician, reviewed the evidence of record and concurred with Dr. Whitley's assessment. (Tr. 166).

On January 31, 2005, Dr. Neville, a State Agency psychologist, reviewed the evidence of record and opined Summerlot had a mild degree of limitation in the functional areas of "Restriction of Daily Activities" and "Difficulties in Maintaining Concentration, Persistence, or Pace," and was moderately limited in the functional area of "Difficulties in Maintaining Social Functioning." (Tr. 177). Dr. Neville indicated that Summerlot "appears capable of performing & maintaining tasks, when in an environment that requires minimal interaction w/ others." (Tr. 183). On April 21, 2005, Dr. D. Unversaw, ("Dr. Unversaw"), also a State Agency psychologist, reviewed the evidence of record and affirmed Dr. Neville's assessment. (Tr. 183).

    e.  Dr. Michael Epstein ("Dr. Epstein")

On February 11, 2005, Summerlot saw Dr. Epstein for APS and her six recent miscarriages. (Tr. 185). Dr. Epstein reviewed Summerlot's medical history and noted that in 2002 Summerlot was found to have a positive IgG and IgM anticardiolipin antibodies. (Id.). Summerlot reported that she developed multiple problems, including numbness in her extremities and recurrent leg weakness, bouts of dizziness and blurry vision, and pain throughout her whole body. (Id.). On examination, Dr. Epstein reported that Summerlot appeared well, but that Summerlot's complaints were suggestive of fibromyalgia. (Tr. 186). Accordingly, he referred her for a rheumatology evaluation. (Id.). Summerlot's anticardiolipin anitbodies were

7

then tested on February 11, 2005, and this time the results were negative. (Tr. 190-92).

   g.  Dr. Thomas J. Curfman ("Dr. Curfman)

On February 21, 2005, Summerlot saw Dr. Curfman for complaints of "dizziness with blurred vision and episodic numbness with an inability to talk or respond to her surroundings" that often occurred when she was upset or crying. (Tr. 204). Dr. Curfman suspected most of her symptoms related to "migrainous tendency" with a possible "component of anxiety attacks with hyperventilation contributing to her episodes of weakness and inability to speak." (Tr. 205). He suggested that Summerlot's hand numbness was likely due to carpal tunnel syndrome. (Id.). Summerlot subsequently underwent a nerve conduction study and EMG and the results were normal. (Tr. 197, 200, 203). Dr. Curfman reported that there was "no evidence for significant nerve injury for her parathesias." (Tr. 203).

   h.  Cleveland Clinic

On March 17, 2005, Summerlot went to the Cleveland Clinic for evaluation. (Tr. 209-26A). She complained of constant pain in her head and body. (Tr. 212). Dr. Paul Masci ("Dr. Masci"), reported that Summerlot appeared well, her cranial nerve examination was unremarkable, her heart sounds were normal, her extremities were free of edema, and her strength and power were normal in both the upper and lower extremities. (Tr. 211). The MRI of Summerlot's brain was normal, as was a nerve conduction study/EMG. (Tr. 214). Summerlot was diagnosed with probable fibromyalgia and put on Elavil. (Tr. 217).

 B. Standard of Review

The standard of review for an ALJ's decision is whether it is supported by substantial evidence and free of legal error. See 42 U.S.C. § 405(g); Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005); Golembiewski v. Barnhart, 322 F.3d 912, 915 (7th Cir. 2003). Substantial

evidence means such relevant evidence as a reasonable mind might accept to support such a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). A reviewing court is not to substitute its own opinion for that of the ALJ's or re-weigh the evidence, but the ALJ must build a logical bridge from the evidence to his conclusion. Haynes, 416 F.3d at 626; Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001). This standard is deferential but not entirely uncritical, for an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. Golembiewski, 322 F.3d at 915. Alternatively, an ALJ's legal conclusions are reviewed *de novo*. Haynes, 416 F.3d at 626.

    C.    Summerlot's Motion for Summary Judgment or Remand

To be entitled to benefits under 42 U.S.C. §§ 423, 1321a, Summerlot must establish that she was "disabled." See 42 U.S.C. § 423(a)(1)(D). The Social Security Act defines "disability" as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). The Social Security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments, (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity, (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work, and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(I)-(v), 416.920, Briscoe v. Barnhart, 425 F.3d 345, 352

(7th Cir. 2005). If the ALJ finds that the claimant is disabled or not disabled at any step, he may make his determination without evaluating the remaining steps. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). If there is an affirmative answer at either step three or step five, then there is a finding of disability. Briscoe, 425 F.3d at 352. At step three, if the impairment meets any of the severe impairments listed in the regulations, the impairment is acknowledged by the Commissioner. See 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. app.1, subpart P, § 404. However, if the impairment is not so listed, the ALJ assesses the claimant's residual functional capacity, which in turn is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform work in society at step five. 20 C.F.R. § 404.1520(e). The claimant bears the burden of proof on steps one through four, but the burden shifts to the Commissioner at step five. Id.

Summerlot asserts four arguments regarding the ALJ's assessment of her case. First, Summerlot contends that the ALJ failed to give the appropriate amount of deference to the opinion of her treating physician. Second, Summerlot alleges that the ALJ improperly minimized Dr. Von Bargen's assessment. Third, Summerlot argues that the ALJ improperly evaluated her credibility. Lastly, Summerlot contends that the ALJ's RFC finding is flawed because the ALJ misconstrued a material piece of evidence.

1. The ALJ's evaluation of Summerlot's treating physician is supported by substantial evidence.

Summerlot contends that the ALJ erred by not assigning more evidentiary weight to the opinion of her treating physician, Dr. Clouse. An ALJ is to give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory

diagnostic techniques and consistent with other substantial evidence in the record. Hofslien v. Barnhart, 439 F.3d 375, 376 (7th Cir. 2006); Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000); 20 C.F.R. § 404.1527(d)(2); S.S.R. 96-8p; S.S.R. 96-2p. More weight is generally given to the opinion of a treating physician because he is more familiar with the claimant's conditions and circumstances. 20 C.F.R. § 404.1527(d)(2); Clifford, 227 F.3d at 870. However, medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence in the record. Id. When evidence in opposition to the presumption is introduced, the rule drops out and the treating physician's evidence is just one more piece of evidence that the ALJ must consider. Hofslien, 439 F.3d at 377. Nevertheless, an ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." 20 C.F.R. § 404.1527(d)(2); S.S.R. 96-8p.

Regardless of how much weight the ALJ assigns to any physicians, an ALJ must, at least, address the claimant's treating physicians' opinions and explain the weight given to them before affording greater weight to that of a non-treating physician. See 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination of decision for the weight we give your treating source's opinion."); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995). While the ALJ is not required to award a treating physician controlling weight, the ALJ must, at a minimum, sufficiently articulate his reasoning for not doing so. Id. In the immediate case, the ALJ offered a sufficient explanation of the weight given to the opinions of Summerlot's actual treating physician, Dr. Clouse, and, therefore, met the required threshold. See 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination of decision

11

for the weight we give your treating source's opinion.").

Summerlot contends that the ALJ erred by not assigning more evidentiary weight to the opinion of her treating physician, Dr. Clouse. This Court does not find this argument persuasive. Disclaiming the weight given to Dr. Clouse's opinion regarding the limiting effects of Summerlot's impairment, the ALJ found:

> This residual functional capacity [Dr. Clouse's medical opinion] is even more limited than the claimant and her husband have reported (Exs. 2E and 4E) and the testimony indicated. It is not well supported by objective observations in the doctor's own treatment records, which show only observations of diffuse tender points and a flat affect. It is based to a large extent on the claimant's exaggerated subjective complaints of pain and fatigue. The opinion is inconsistent with other evidence in the record, namely the findings of the State Agency physician (Ex. 6F). . . . For all these reasons, Dr. Clouse's opinion is given little weight.

(Tr. 23-24).

The ALJ made sufficiently clear the amount of weight he gave to Dr. Clouse's medical opinion and the reasons for that weight. See 20 C.F.R. § 404.1527(d)(2); S.S.R. 96-8p. First, the ALJ noted that Dr. Clouse's opinion was "even more limited than the claimant and her husband have reported (Exs. 2E and 4E) and the testimony indicated." See Tr. 23. The ALJ explained that both Summerlot and her husband reported that on "[s]ome days she cleans house, dusts, and does laundry." See Tr. 19. Further, the ALJ stated that Summerlot and her husband also reported that she "is independent in caring for her personal needs and hygiene," can handle money, and can cook simple meals. Id. However, the ALJ reasoned that despite evidence of such activity, Dr. Clouse's opinion still asserted that Summerlot only "had limited ability to push and pull with all extremities" and "could perform no postural movements at all." See Tr. 23. Thus, because the ALJ sufficiently noted the sharp contrast that existed between Summerlot and her husband's testimony of her activity and Dr. Clouse's extremely limited opinion, the ALJ may properly give

Dr. Clouse's opinion less weight.

The ALJ further observed that Dr. Clouse's opinion was unsupported by medically acceptable clinical and laboratory diagnostic techniques. See Hofslien v. Barnhart, 439 F.3d 375, 376 (7th Cir. 2006); Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000); 20 C.F.R. § 404.1527(d)(2); S.S.R. 96-8p; S.S.R. 96-2p. The ALJ noted that Dr. Clouse's findings were unsupported by "objective observations in the doctor's own treatment records" and that Dr. Clouse's records only revealed "observations of diffuse tender points and a flat affect." See 20 C.F.R. § 416.927(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion"). The ALJ explained that Dr. Clouse's opinion was based to a large extent on Summerlot's "exaggerated subjective complaints of pain and fatigue." See Tr. 23. To support his conclusion, the ALJ stated that Dr. Clouse's records simply indicated "that claimant complained of fatigue, muscle aches, pain, and memory problems" but failed to provide any substantial objective findings confirming any diagnosis. Id. Therefore, because the ALJ properly demonstrated that Dr. Clouse's opinion lacked medical evidence and objective observations, the ALJ may give less weight to her opinion. See Rice v. Barhnart, 384 F.3d 363, 371 (7th Cir. 2004) (The ALJ may properly reject a doctor's opinion if it is based on subjective allegations rather than objective observations.).

The ALJ also contended that Dr. Clouse's medical evidence is inconsistent with other evidence in the record. See 20 C.F.R. § 416.927(c)(2) (Medical evidence may be discounted if its internally inconsistent or inconsistent other evidence). Notably, the ALJ concluded "the State Agency opinion supports the proposition that the claimant's physical impairments are not of

disabling severity." See Tr. 24. The ALJ determined that the State Agency pyschologists' observations that Summerlot only had "mild limits on concentration" and "mild restrictions on daily activities, moderate limits of social functioning, and no episodes of decompensation" stood for the proposition that Summerlot's "physical impairments are not of disabling severity." See Tr. 23-24. Accordingly, the ALJ properly demonstrated that this evidence is inconsistent with Dr. Clouse's opinion, which asserted that Summerlot is extremely limited in her ability to function. Compare Tr. 23. Therefore, because sufficient contradicting evidence was introduced, this Court holds that the ALJ's decision to afford the treating physician's opinion lesser weight is substantially supported. See Hofslien v. Barnhart, 439 F.3d 375, 376 (7th Cir. 2006).

Summerlot also argues that the ALJ improperly minimized Dr. Von Bargen's assessment of Summerlot's mental impairments. The Court does not find this argument persuasive. With regards to Summerlot's mental functioning, the ALJ reviewed all the evidence of record and noted the absence of a treating mental health specialist. See Tr. 23. He stated that the State Agency psychologists had opined that Summerlot "had only mild limits of concentration as well as mild restrictions of daily activities." Id. However, the ALJ specifically stated that he "does not entirely agree with the State Agency psychologists" and articulated that "greater weight is given to Dr. Von Bargen as an examining source." Id. Therefore, Summerlot's argument is not persuasive because, contrary to Summerlot's contention that opinion is minimized, the ALJ specifically gave "greater weight" to Dr. Von Bargen's opinion than even the State Agency psychologists. Id.

In conclusion, this Court finds that the ALJ's decision not to award Dr. Clouse's opinion controlling weight and the ALJ's analysis of Dr. Von Bargen's opinion were supported by

14

substantial evidence and sufficiently articulated.

        2.      <u>The ALJ's determination of Summerlot's credibility is supported by substantial evidence.</u>

Summerlot also contends that the ALJ improperly evaluated her credibility. Because an ALJ is in a special position where he can hear, see, and assess witnesses, an ALJ's credibility determinations are given special deference, and as a result, an ALJ's credibility determinations will only be overturned if they are patently wrong. <u>Jens v. Barnhart</u>, 347 F.3d 209, 213 (7th Cir. 2003); <u>Zurawski v. Halter</u>, 245 F.3d 881, 887 (7th Cir. 2001). However, as a bottom line, Social Security Ruling 96-7p requires an ALJ to consider the entire case record and articulate specific reasons to support his credibility finding. <u>Golembiewski v. Barnhart</u>, 322 F.3d 912, 915 (7th Cir. 2003); <u>Steele v. Barnhart</u>, 290 F.3d 936, 942 (7th Cir. 2002). While an ALJ is not required to provide a "complete written evaluation of every piece of testimony and evidence," an ALJ cannot simply state that an the individual's allegations have been considered or that the individual's allegations are not credible. <u>Rice v. Barnhart</u>, 384 F.3d 363, 370 (7th Cir. 2004); <u>Golembiewski</u>, 322 F.3d at 915; <u>Zurawski v. Halter</u>, 245 F.3d 881, 887 (7th Cir. 2001); S.S.R. 96-7p. Also, the ALJ may not simply recite the factors that are described in the regulations for evaluating symptoms. <u>Zurawski</u>, 245 F.3d at 887; S.S.R. 96-7p. Nonetheless, "only if the trier of facts grounds his credibility finding in an observation or argument that is unreasonable or unsupported. . . can the finding be reversed." <u>Prochaska v. Barhart</u>, 454 F.3d 731, 738 (7th Cir. 2006) (citations omitted).

Regarding Summerlot's credibility, the ALJ found:

> The claimant is not entirely credible. Since application date, she was responsible for caring for a baby by herself when her husband was working

> and her older children were at school, which involves a certain amount of lifting and carrying and physical activities. The reports of contact with the claimant and her husband in the records (Exs. 2E, 4E), revealed that the claimant was more active at home on a daily basis than what was claimed in the testimony. The claimants failure to seek help from mental professionals for most of the time since the application date suggests that she did not feel her mental problems were as bad as she alleges now. The claimant's complaint of great weakness and problems in balance are contradicted by the nearly normal findings at the consultative exam done by Dr. Michael Holton on December 14, 2004 (Exs. 3F).

(Tr. 22).

The ALJ's finding that Summerlot's assertions of limiting pain were not fully credible is supported by substantial evidence. In the present case, the ALJ properly construed the evidence and gave a detailed analysis of his credibility finding. First, the ALJ indicated that Summerlot's household activities, such as how she cared for her baby by herself while her husband was at work, involved a certain amount of lifting and physical activity. See Tr. 22. The ALJ posited that this suggests greater functionality than Summerlot let on. Id. The ALJ also noted that Summerlot and her husband's testimony, which reported that on "[s]ome days she cleans house, dusts, and does laundry" and that she "is independent in caring for her personal needs and hygiene," also suggests that she is more active at home than she claims. See Tr. 19, 22. Additionally, the ALJ also contrasted Summerlot's complaints of "great weakness and problems in balance" with the results of Dr. Holton's consultative exam. See Tr. 22. Dr. Holton's exam, contrary to Summerlot's contentions, revealed "nearly normal findings" in regards to Summerlot's weakness and balance issues and that "[h]er gait and station were normal" and her "[s]trength was fully normal at 5/5 in all her extremities, and there was no muscle spasm or atrophy." Id. Moreover, the ALJ also pointed out that Dr. Curfman's findings further discredit Summerlot's testimony. Id. Specifically, the ALJ noted that Dr. Curfman's examination also

revealed that, contrary to Summerlot's contentions, her "[s]peech, gait and station were all normal," as was her strength. Id.

This Court will not disturb a credibility finding unless it is patently wrong. Wolfe v. Shalala, 997 F.2d 321, 326 (7th Cir. 1993). Because the ALJ relied on substantial evidence in the record and sufficiently articulated his reasoning for discrediting Summerlot's testimony, this Court finds the ALJ's credibility determination to be reasonable.

### 3. The ALJ's RFC finding is supported by substantial evidence

Summerlot additionally argues that the ALJ misconstrued a material piece of evidence, evidence of her emergency room visit for migraine headaches, while he conducted his RFC analysis. Although an ALJ need not discuss every piece of evidence, he must consider and evaluate all the record evidence, including evidence that is contrary to his conclusion. Indoranto v. Barhart, 374 F.3d 470, 474 (7th Cir. 2004); Diaz v. Chater, 55 F.3d 300, 307-308 (7th Cir. 1995). Further, an ALJ may not fail to discuss an entire line of evidence. Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995). This Court will reverse an ALJ's decision when the finding "is unreliable because of serious mistakes or omissions." Sarchet v. Chater, 78 F.3d 305, 308 (7th Cir. 1996); see also Carradine v. Barhart, 360 F.3d 751, 754 (7th Cir. 2004) (noting that remand is appropriate when the ALJ "based his determination on serious errors in reasoning").

In the instant case, the ALJ committed an error by misconstruing a piece of evidence. Regarding Summerlot's migraines, the ALJ erroneously claimed:

> "[t]here is no medical corroboration that the claimant is having so many migraine headaches nor that they are as severe as she claims; there is no evidence that she ever went to the Emergency Room with a severe migraine headache, and she has not been prescribed the usual anti-migraine medications, which suggests that they are not as disabling as she contends."

17

See Tr. 23. Contrary to the ALJ's assertion, however, the evidence in the record indicates that, on July 20, 2004, Summerlot went to Kosciusko Community Hospital with complaints of migraine headaches. See Tr. 120. While at the hospital, Summerlot was given an injection of Demerol and diagnosed with a migraine headache and then discharged home. See Tr. 121-122. Despite evidence that Summerlot did make an emergency room visit complaining of a migraine, the ALJ misstated the record and claimed that there is "no evidence that she ever went to the Emergency Room." See Tr. 23.

While the ALJ committed an error by misstating the record, this Court finds that such error is harmless and not material to the outcome of the ALJ's RFC finding. As the ALJ correctly noted, there is very little evidence in the record "that the claimant is having so many migraine headaches nor that they are as severe as she claims." See Tr. 23. Other than a single emergency room visit, Summerlot did not point to other evidence in the record in order to validate her complaints of migraines. Id. The ALJ also pointed out that she has not even been prescribed "the usual anti-migraine medications," which suggests Summerlot's migraines were not severely disabling. Id. Furthermore, the ALJ's misstatement regarding Summerlot's migraines is not material to the outcome of the case because Summerlot primarily alleged disability due to anxiety and anti-phospholoid syndrome, not migraine headaches. See Tr. 67. Thus, this Court concludes that the ALJ's minor misstatement regarding Summerlot's migraine headaches was not material to the ALJ's determination regarding disability. Because the ALJ did not base his determination on serious errors in reasoning, but rather committed one harmless and immaterial error in an otherwise thorough analysis, this Court finds the ALJ's RFC finding was supported by substantial evidence. See Sarchet v. Chater, 78 F.3d 305, 308 (7th Cir. 1996);

see also Carradine v. Barhart, 360 F.3d 751, 754 (7th Cir. 2004)

### III. CONCLUSION

The ALJ's determination that Summerlot's treating physician was not entitled to controlling weight and the ALJ's assessment of Dr. Von Bargen's opinion were supported by substantial evidence. Further, the ALJ's analysis of the claimant's credibility was also supported by substantial evidence. Finally, the ALJ's RFC finding was supported by substantial evidence, despite the ALJ's harmless error regarding Summerlot's emergency room visit. Therefore, Summerlot's motion for remand is **DENIED**. [Doc. No. 15]. This Court **AFFIRMS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g). The clerk is instructed to term the case and enter judgment in favor of the Commissioner.

**SO ORDERED**

Dated this 23rd Day of June, 2009.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge